## M. J. Braden, *et al. v.* John W. Stumph, *et al.*

1. County Seat. *Removal of. Number of voters necessary.* Under the Constitution of 1870, Article 10, section 4, which provides that the seat of justice of a county shall not be removed without the concurrence of two-thirds of the qualified voters of the county, there must be an active concurrence and not a passive acquiescence, and therefore two-thirds of the qualified voters must actually vote in favor of the removal.

2. Same. *Same. County court. Count of vote by. Not final.* The statute, which provides for the holding of an election to remove the seat of justice of a county, directs the sheriff to make his return of the vote to the judge or chairman of the county court, and that at the next quarterly session of the court the vote shall be counted, and the result declared. *Held,* that the action of the court in counting the vote and declaring the result is not final and conclusive.

3. Same. *Same. Same. Order of. Bill filed to enjoin. Jurisdiction of chancery court.* The court of chancery has jurisdiction, upon a bill filed by citizens and tax payers of the county, to enjoin proceedings under the order of the county court, and to determine, upon proof *aliunde,* the sheriff's return and action of the county court, that two-thirds of the qualified voters of the county did not actually vote at the election, and to annul the proceedings of the county court.

4. Same. *Same. Election returns. Falsity of. How it may be established.* It is competent, under such a bill, to prove by the qualified voters of the county that they did not actually vote at the election; and if the number of those voters who so testify, when added to the vote cast at the election, is sufficient to show that two-thirds of the qualified voters had not voted for the removal, the falsity of the return may be thus established.

5. Same. *Same. Pending litigation. Relief.* If the bill be filed before the right to make the removal is complete, relief will be granted, although, pending the litigation, the removal of the courts and county offices may be consummated.

6. Same. *Same. Witness. Failure to testify that he is a male citizen. Knowledge of commissioner as evidence.* If the examination and cross-examination of the voters introduced as witnesses plainly show that they were treated throughout as male citizens, an objection that they

failed to testify to the fact will not be entertained, in the absence of anything tending to raise even a suspicion to the contrary, and the testimony of the commissioner who took the depositions, based on his personal knowledge and observation of the witnesses, that they were males, would be competent evidence, without recalling the witnesses themselves.

## FROM M'NAIRY.

Appeal from the Chancery Court at Purdy. GEO. H. NIXON, J.

PITT & HAYS for complainants.

ALEX. W. CAMPBELL and W. M. INGE for defendants.

COOPER, J., delivered the opinion of the court.

The Constitution of 1870, Article 10, section 4, contains the following provisions: "No part of a county shall be taken off to form a new county, or a part thereof, without the consent of two-thirds of the qualified voters in such part taken off; and, where an old county is reduced for the purpose of forming a new one, the seat of justice in said old county shall not be removed without the concurrence of two-thirds of both branches of the Legislature, nor shall the seat of justice of any county be removed without the concurrence of two-thirds of the qualified voters of the county." By the act of 1873, chapter 103, and the amendatory act of 1881, chapter 98, the Legislature has authorized the people of any county in the State, any old county whose territory has been reduced for the purpose of forming a new one, to remove their

seat of justice in the mode prescribed. That mode is by the county court of the county ordering an election to be held by the sheriff within a given time, upon notice, the voter being required to put on his ballot the name of the place to which he desires the county seat removed, or the words, "no removal." Section 6 of the act of 1873 authorized the removal, if the vote cast for the removal to the particular place was equal to two-thirds of the vote cast at the next preceding governor's election. This section was held to be unconstitutional in a case presently to be mentioned, but the act was in other respects sustained. The seventh section is as follows: "That the sheriff shall make his return to the judge or chairman of the county court, and at its next quarterly session after the election the vote shall be counted and the result declared, and if the proposition to remove the county seat receive the requisite number of votes, then the county court shall proceed to make all necessary provisions for the removal."

The county of McNairy is an old county, whose territory has been reduced for the purpose of forming a new one, but is brought within the act of 1873 by the act of 1881, chapter 98. The seat of justice of such a county can not be removed without the concurrence of two-thirds of both branches of the Legislature, and two-thirds of the qualified voters of the county. At the July term, 1884, of the county court of the county, an order was made, under the acts of the Legislature, to hold an election on the question of the removal of the county seat from Purdy

to Falcon. And the election was held accordingly, on August 23, 1884, and the result returned by the sheriff to the county court. At the next quarterly term of the county court after the election, on the 6th day of October, 1884, the following entry was made on the minutes:

" In the matter of the removal of the county seat, before the counting of the vote, and the declaration of the result of the election held on the 23d of August, 1884, upon the question of the removal of the county seat from Purdy to Falcon, and pending the discussion of the same, S. D. Hays, attorney for the citizens and tax-payers of Purdy, offered to introduce proof to show that two-thirds of the qualified voters of McNairy county had not concurred in the vote upon the removal. He offered to show, by proof showing the number of qualified voters in each civil district in the county who did not vote in said election, that more than one-third of such qualified voters have not concurred; which offer and motion were refused by the court. He thereupon moved, as a mode of ascertaining the number of qualified voters in McNairy county, and with a view to ascertaining whether two-thirds had concurred in the election, as required by the Constitution and laws of Tennessee, that the court appoint a commission from its number, whose duty it shall be to ascertain the number of qualified voters in McNairy county, and report their action to the next term, which motion was disallowed and exception taken."

Then follows this entry:

" Be it remembered, that on this, the 6th day of October, 1884, in quarterly session assembled, the county court of McNairy county, Tennessee, counted the vote, and compared the result of the election held on the 23d of August, 1884, upon the question of the removal of the county seat from Purdy to Falcon; and it appearing to the satisfaction of the court that there were cast for removal to Falcon 1,921 votes, and against removal 560; for removal to Bethel one vote; for removal to Sim Tatum's place two votes, and for removal two votes. And it further appearing to the satisfaction of the court that 1,921 votes are more than two-thirds of the qualified voters of McNairy county, and the court doth so order and declare. And it further appearing to the satisfaction of the court that two-thirds of the qualified voters of McNairy county have concurred in the removal of the county seat to Falcon, it is therefore ordered, adjudged and decreed that the county seat of McNairy county be and is hereby declared to be removed to Falcon. It is further ordered that J. L. Smith (and three other persons named), be and are hereby appointed a committee to remove the records of McNairy county to Fal-

Braden *v.* Stumph.

con, and to procure suitable buildings for the safe keeping of the same, and to perform such other acts as are necessary to carry out this decree. And it is further ordered that the clerk of the court proceed at once to remove the books and papers pertaining to the court to Falcon."

On March 10, 1885, the Legislature, by the act of 1885, chapter 33, two-thirds of both houses concurring, sanctioned the removal of the county seat from Purdy to McNairy. In the meantime, on October 10, 1884, four days after the order of the county court declaring the result of the election, the bill before us was filed by some of the citizens and taxpayers of McNairy county, against the justices of the county court and the various county officers and the committee appointed by the county court to carry out the removal ordered. The main object of the bill, and the only one material to be noticed, was to establish as a fact that two-thirds of the qualified voters of the county had not voted for the removal of the county seat to Falcon, at the election of August 23, 1884, and that the declaration of the county court to the contrary was untrue. Some of the defendants appeared and made defense, the larger number allowing the bill to be taken for confessed against them. The chancellor overruled the preliminary defenses by plea in abatement, motion to dismiss, etc., and the contestants finally answered, denying the material averments of the bill. The complainants took the depositions of over five hundred witnesses, who proved that they had all the requisites to make them qualified voters of McNairy county, and that they had not voted at the election. Upon final hearing, the chancellor found the fact to be that

1,921 votes, the number in favor of the removal to Falcon, as declared by the county court, did not show a concurrence of two-thirds of the qualified voters of the county, on the day of the election, in the removal. He also found that the order of the county court for the removal, and the appointment of the committee to execute the order, were unconstitutional and void, because made before the Legislature, by a vote of two-thirds of both houses, had concurred in the removal. He decreed that the complainants were entitled to the relief sought, and perpetually enjoined all action under the order of the county court. The contestants appealed.

The committee appointed by the county court, by its order of October 6, 1884, to carry out its order, acted with promptness, and on the next day took possession of the books of the various county offices, and carried them to Falcon. Some of them were afterward brought back to Purdy under orders of the chancellor in this cause, and all the courts were held in Purdy, until the Legislature had concurred in the removal to Falcon, and by two acts of March, 1885, authorized the holding of the circuit and chancery courts at Falcon. Upon these facts, the point is made that the removal has been consummated, and can not now be interfered with by the courts, the cases of *Ford* v. *Farmer*, 9 Hum., 151, and *Brigenor* v. *Rodgers*, 1 Cold., 261, being cited in support of the position. But this bill was filed before the removal was sustained by the Legislature, and therefore before it could be constitutionally made, and if the

complainants were then entitled to the relief sought by way of prevention, they would still be entitled to the same relief, so far as this point is concerned.

It is also insisted by the appellants that the complainants have omitted, in taking the depositions of their witnesses, to prove by them the most essential qualification of a voter, namely that each was a male, not a female, and that only the best evidence of the fact can be received in a case of this character. But the depositions upon their face show that the witnesses were treated throughout the examination as male citizens, the appellants, in their cross examination, shaping their interrogatories upon that supposition. The witnesses do, in effect, say, that they are qualified voters, specifying all the necessary qualifications except the qualification of sex. We think there is sufficient on the face of the depositions, in the absence of anything tending to raise even a suspicion to the contrary, to show that the appellants conceded the qualification of sex. And if there were any doubt on this point, we are of opinion that the evidence of the commissioner who took all the depositions, and who speaks from personal knowledge or inspection of the parties, that the witnesses were males, was competent and sufficient, without recalling each witness, to make out a *prima facie* case, and to throw the burden upon the appellants to rebut the presumption.

If the testimony was admissible, the appellants do not deny, but virtually concede, that at the election of August 23, 1884, two-thirds of the qualified voters of the county did not actually vote for the removal

of the county seat from Purdy to Falcon. Their contention, in this view, is that the constitutional provision only requires the concurrence of two-thirds of the qualified voters actually voting at the election, the presumption being that those who do not vote concur with the two thirds of those who do vote. It is further insisted that the act of the county court in declaring the result of the election is final, and can not be impeached by parol proof, or reviewed by the chancery court at the instance of private citizens. These are contentions that go to the merits, and are not altogether new in this State.

The first case in our books which touches any of these questions is that of the *Louisville & Nashville Railroad Company* v. *County Court of Davidson*, 1 Sneed, 637. In that case two counties, under authorizing statutes, held elections to test the sense of voters of the county to a subscription to the capital stock of the railroad company. One of the statutes required a majority of the votes polled at the election. The other act required a majority of the voters of the county. "The question made," says Judge Caruthers, in delivering the opinion of the court, "is whether this (the latter) act requires a majority of all the legal voters residing in the county at the time of the election, or only a majority of those who may attend the polls and actually vote. We are referred to the latest State and county elections to show the number of voters in the county, and then to the vote on this question to prove that the number of affirmative voters falls very far short of a majority of the

legal voters in the county, although they exceed by several hundred the negative votes. How can we know how many legal voters there are in a county at any given time? We can not judicially know it. If it were proved that the vote was much larger in the last preceding political election, or by the last census, by the official returns, or the examination of witnesses, it would only be a circumstance, certainly not conclusive, that such was the case at the time of this election. But we put our decision of the question upon a more fixed and stable ground. When a question, or an election is put to the people, and is made to depend upon a vote of the majority, there can be no other test of the number entitled to vote but the ballot-box. If in fact there be some, or many, who do not attend and exercise the privilege of voting, it must be presumed that they concur with the majority who do attend, if, indeed, they can be known at all to have an existence."

The provision of the Constitution quoted at the beginning of this opinion commences thus: "No part of a county shall be taken off to form a new county, or a part thereof, without the consent of two-thirds of the qualified voters in such part taken off." In a case arising under this clause of the Constitution, it was held that the word "consent," as used therein, means the active concurrence of the voters, and not a passive acquiescence, and that two thirds of the qualified voters must actually vote for the change. It was further held, upon bill filed in the chancery court by the justices of the old county against the

commissioners authorized to hold the election, that
the fact that two thirds of the qualified voters did
not consent by voting might be shown by proof:
*Cooke* v. *Gooch*, 5 Heis., 294. It was said in the
opinion delivered that the decision in the *Railroad
Company* v. *Davidson County*, 1 Sneed, 637, was not
in conflict with the conclusion reached, the court
concurring in the argument of that case, and the
construction of the statutes in question. The same sec-
tion of the Constitution of 1870, then and now under
discussion, provides that the credit of no county, city or
town, shall be given or loaned to any person, corpora-
tion, etc., except upon an election to be first held of
the qualified voters, "and the assent of three-fourths of
the votes cast at such election." It was said in the
opinion delivered in *Cooke* v. *Gooch*, that the milder
word "assent" was used in this clause "because the
actual approbation of the voters is not required."

In *Bouldin* v. *Lockhart*, 3 Baxt., 262, a vote had
been taken, under the act of 1873, chapter 103, to
remove the seat of justice of Grundy county, and the
county court had at first counted the vote and an-
nounced that there was a majority of two votes in
favor of no removal, but immediately afterward heard
proof, purged the polls, and announced the result in
favor of removal. A petition was filed by certain
citizens and tax-payers of the county against the jus-
tices of the county court, to bring the proceedings
into the circuit court, by writs of *certiorari* and *su-
persedeas*, for revision. It was held that the duty
of the county court, under the act, "to count the

votes and declare the result," was not judicial, and, therefore, that the writs would not lie. It was added, by way of *dicta*, that, under the act of 1873, the county court had no power to receive parol proof, and purge the polls, and that the word "concurrence," in the sixth section of the statute, meant an active, affirmative act on the part of the voters.

After this decision, a bill was filed by "citizens and tax-payers" of the county to prevent the removal of the county seat, or to obtain a decree declaring the order of removal made by the county court void. Upon the final hearing of the cause by this court, it was held that the action of the county court, treated as legislative, was subject to revision by the courts, and that the order of the county court, the order showing on its face that the removal was made "because two-thirds of the votes in the county, making the governor's election the test, and two thirds of all the votes cast," were for removal, was void. It was further held that the complainants were entitled to relief, although the removal of the county seat had actually been consummated before the filing of the bill. The question was reserved, whether the order would not have been final, if it had declared that the removal had been sustained by two-thirds of the entire vote of the county: *Bouldin* v. *Lockhart*, 1 Lea, 195.

In *Stuart* v. *Bair*, 8 Baxt., 141, the bill of "citizens and tax-payers" of a county was sustained, upon demurrer, which sought to prevent the removal of the seat of justice by virtue of the acts of the Leg-

islature, without a popular vote.    One of these acts undertook to extend the corporate limits of the county town about two miles, so as to include the site to which the proposed removal was to be made, which statute was, however, never acted on.    The other act authorized the courts to be removed from the old to the new site.

In *Combs* v. *Stumph,* 11 Lea, 26, the bill was filed by citizens and tax-payers of McNairy county against the justices of the county court, to enjoin the holding of a popular election, under an order of the county court, to ascertain the wish of the people as to the removal of the seat of justice, the order being made in pursuance of certain acts of the Legislature held to be unconstitutional.    The relief prayed was granted.

Three of the foregoing cases do hold that the "consent" or "concurrence" of two-thirds of the qualified voters, required by the clause of the Constitution under consideration, means positive approval by actual vote, and not mere tacit acquiescence with the result of the election by not voting.    One of them decides that the county court, in counting the vote and declaring the result, has no power to receive parol proof, and purge the polls, and that its action is not judicial.    Another case determines that the action of the county court, even if legislative, is subject to the revision of the chancery court.    And four of them sustain such a bill when filed by citizens and tax-payers of the county.    These cases, unless overruled, do settle most of the questions so elaborately argued by the appellants' counsel.    Some of these questions,

if new, might admit of grave doubt. I am myself unable to see any distinction between the meaning of the words consent, concurrence and assent, as used in the clause of the Constitution cited, and am inclined to think that the rule adopted in the *Railroad Company* v. *Davidson County*, for the construction and application of analogous words in a statute, might well have been followed in construing and applying the language of the Constitution. But this court has thrice announced a different doctrine, and a majority of its members are not inclined to change it.

The only material point which has not been heretofore decided is, whether the declaration of the result of the popular election is conclusive upon other courts. The entry on the minutes of the county court shows that 1,921 votes were found to have been cast for removal to Falcon. After giving the detail of the votes, the entry adds: "And it further appearing to the satisfaction of the court, that 1,921 voters are more than two-thirds of the qualified voters of McNairy county, the court doth so declare; and it further appearing to the satisfaction of the court that two-thirds of the qualified voters of McNairy county have concurred in the removal to Falcon, it is therefore ordered, adjudged and decreed that the county seat of McNairy county be and is hereby removed to Falcon." Taking the whole entry together, it does not mean to declare that two-thirds of the qualified voters had actually voted for the removal, but only that 1,921 voters had so voted, and that this number constituted more than two-thirds of the qualified voters of the county. And

the question is, whether this fact can be contested and shown not to be true, under a bill in chancery filed for the purpose?

The opinion in *Bouldin* v. *Lockhart*, 1 Lea, 195, a case in which I did not sit because incompetent, while reserving the question whether the declaration that two-thirds of the qualified voters had voted for the removal would be final, also says that the· act of the county court, although legislative in its character, like an act of the Legislature itself, would be subject to revision by the courts. . And all of our authorities agree that if there is a remedy in equity, it may be had upon a bill filed by individual citizens and tax-payers. The bill in this case was filed before the removal could be legally consummated, because it was filed before the consent of the Legislature, by a vote of two-thirds of both houses, had been given. The removal could not be legally made in this case until such consent was obtained. It was otherwise in the case of Grundy county, which came before me as chancellor, in *Sanders* v. *Metcalf*, 1 Tenn. Ch., 419. There, the removal of the seat of justice was consummated by the action of the county court, and I was then of opinion that such action was final, and could not be reviewed by the courts at the instance of private citizens. At that time, the first of the above cited decisions of this court, made since the adoption of the Constitution of 1870, had not been published. And the tendency of the subsequent decisions has been to uphold the right of the citizen to impeach the ˙election, and the action of the

Braden *v.* Stumph.

county court in declaring the result, even after an actual removal of the county offices, in accordance with the order of the county court. The logical conclusion from these decisions to which a majority of the court adhere, is that the declaration of the county court is not conclusive, and that the aggrieved citizens may show that 1,921 voters are not two-thirds of the qualified voters of the county. And the proof in this case establishes the fact.

The result is that the chancellor's decree must be affirmed with costs.

COOKE, J., dissents.

### PETITION TO REHEAR.

Upon petition to rehear, COOPER, J., said:

The petition for rehearing in this case calls our attention to the fact that the act of the Legislature of 1883, chapter 246, is not mentioned in the opinion heretofore delivered. And it is true that this act was overlooked by the judge who prepared the opinion of the court. That act is in these words: "Be it enacted by the General Assembly of the State of Tennessee, two-thirds of both houses concurring, that hereafter county seats of counties that have been reduced by fractions taken off to form new counties may be removed in the manner and under the provisions of law as is now provided for the removal

of county seats in other counties of the State, except the counties of Cocke and Obion." The manner of removing county seats had been provided for by the act of 1873, chapter 103, as to any county except a county reduced by a fraction taken off to form a new county. This act was amended by the act of 1881, chapter 98, so as to provide for the removal of the county seat of any county without exception. These acts were considered in the former opinion as providing the manner of taking the vote of the county in question to ascertain the wishes of its qualified voters, as directed by the Constitution, for the removal of its county seat. The body of the act of 1883, is only a re-enactment of the pre-existing law, with special reference to counties reduced by fractions taken off, but does not change that law in any respect. The enacting clause shows, however, that the latter act was passed with the concurrence of two-thirds of both houses of the Legislature. Upon this clause the point might have been made on the hearing, but was not made, that the assent of the Legislature as prescribed by the Constitution was thereby given to the removal of the county seat in this case, without further legislation. The point was not made, nor the act itself mentioned, in the principal printed arguments submitted in the original hearing, because the Legislature had subsequently, by a special act in relation to McNairy county, both houses concurring, sanctioned the removal of the county seat.

It is not necessary to determine in this case whether the constitutional assent of the Legislature may be

given by a general law, or must be by a special act for a given county.    For here the assent was given in both ways, and the decision of the court was that, although the assent was special, the individual citizens of the county might, under their bill, go behind the action of the county court in counting the vote, and announcing the result of the election held to ascertain whether two-thirds of the qualified voters of the county concurred in the removal, and this although, pending the litigation, the removal of the courts and county offices might have been consummated.    It is true, that in the course of the opinion delivered it was said, *arguendo,* the act of 1883 being overlooked, that the bill was filed before the removal could be legally consummated, because it was filed before the consent of the Legislature, by a vote of two-thirds of both houses, had been given.    But it is also true, and the argument would have been equally good, that the bill was filed before the concurrence of the people to the removal, by a two-thirds vote of the qualified voters of the county, had been given.    The Constitution requires both the assent of two-thirds of the Legislature and of two-thirds of the qualified voters, and the failure of the one is as fatal as the failure of the other.    The county court did not announce that two-thirds of the qualified voters of the county had concurred in the proposed removal, but that 1,921 voters had so voted, and that this number constituted more than two-thirds of the qualified voters.    And this announcement, the court held, could be shown to be untrue, and that relief would be granted, whether

the removal were actually consummated before or after the litigation was commenced.

The argument in support of the petition for rehearing next reviews our cases, being the same mentioned and commented on in our former opinion, and insists that the action of the county court in counting the vote and announcing the result was legislative, and that neither these nor any other cases hold that the courts have the power to review legislative action by proof *aliunde.* But the counting of the vote of a popular election is merely the finding of a fact, even if done by the Legislature, and is not conclusive upon the rights of third parties. And the real question is, whether such finding and announcement, whether legislative, judicial or ministerial, are conclusive upon individuals immediately affected by them in their constitutional rights, or may be reinvestigated in the courts. This court has concluded, in several of the decisions cited, that the case before us is not like the establishment of a new county by the political department of the government, in which the individual citizen has only an interest common to all the citizens, of whom the State is the proper representative, but is more analagous to the case of the removal of county lines, in which the old county has a special interest, which may be enforced, even after the change had been consummated. The constitutional provision in regard to the removal of a county seat was intended to protect the rights of property acquired by the location of a county seat, and those property rights are analagous to the property rights of a county over

its territory. Either for this or some other reason, this court has heretofore repeatedly recognized these rights, and allowed them to be asserted, even after an actual removal of the county seat.

The petition next comments on so much of the entry on the minutes of the county court as relates to the proposed intervention of third parties, and which was copied into the opinion of this court. The argument is that the entry was to that extent unwarranted and void. The counsel may be correct in this position, but the part of the entry thus attacked was copied into the opinion merely as a part of the history of the case. For the opinion itself shows that it cut no figure in the decision of the case, and was, in fact, never referred to. It might be stricken out without affecting the opinion in the least.

It is suggested in the petition that the acts of 1885, authorizing the holding of the chancery and circuit courts at Falcon, are valid acts of ordinary legislation, and prevent the holding of those courts at Purdy. But these acts, treated as permanent removals of the courts from the county seat, would be simply void. For otherwise, the court might do indirectly, by ordinary legislation, what they could not do directly. These acts are precisely of the character of one of the acts held to be unconstitutional and void in *Stuart* v. *Bair*, 8 Bax., 141. The power of the Legislature to authorize the holding of courts temporarily at another place than the county seat, for good reason, is another question altogether.

While fully conscious of the gravity of the questions involved, and of the ability with which they have been presented in the petition for rehearing, we see no sufficient reason for granting a rehearing, and the petition must be dismissed.